IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 1:21-mj-415 |
| QUIN NGOC RUDIN, | **UNDER SEAL** |
| Defendant. | |

**AFFIDAVIT IN SUPPORT OF
A CRIMINAL COMPLAINT AND ARREST WARRANT**

I, Jamie M. Vera, Special Agent of the Federal Bureau of Investigation ("FBI"), being duly

sworn, state:

## I.      Introduction and Agent Background

1.      I make this affidavit in support of a criminal complaint and arrest warrant charging

from in or about April 2020 and continuing at least until in or about May 2021 in the Eastern

District of Virginia (hereinafter "EDVA") and elsewhere, defendant QUIN NGOC RUDIN

(hereinafter "RUDIN") and others known and unknown did knowingly and intentionally conspire

and agree with each other and with others to commit wire fraud, contrary to Title 18, United

States Code, Section 1343, by knowingly devising and intending to devise a scheme and artifice

to defraud and to obtain money and property by means of materially false and fraudulent

pretenses, representations, and promises, and by concealment of material facts, and to transmit

and cause to be transmitted interstate wire communications in furtherance of the conspiracy, all

in violation of Title 18, United States Code, Section 1349.   In sum, RUDIN conspired to and

executed a multi-million-dollar fraud scheme targeting various financial institutions and the

United States Government, and, in particular, for causing an interstate wire within EDVA and elsewhere between June 5, 2020 and June 11, 2020, in the execution of a scheme to defraud.

2.     I have been a Special Agent with the FBI since September 2015. I have received basic law enforcement training at the FBI Academy in Quantico, Virginia. I am currently assigned to the FBI's Washington Field Office, where I am responsible for conducting and assisting with securities fraud and investment fraud investigations, including related white-collar and financial crimes. As such, I have participated in investigations involving mail fraud, wire fraud, securities fraud, bank fraud, money laundering, and conspiracy. I have also received additional training in the area of financial crimes. Prior to my employment with the FBI, I worked for over four years in accounting and finance related roles. I am a Certified Public Accountant and a Certified Fraud Examiner.

3.     This affidavit is intended to show that there is sufficient probable cause for the requested complaint and arrest warrant and does not set forth all of my knowledge about this matter. The facts and information contained in this affidavit are based on my personal observations, my training and experience, information obtained from various law enforcement personnel and witnesses, and information obtained from legal process. All observations referenced in this affidavit that were not personally made by me were relayed to me by the person(s) who made such observations or in reports that detailed the events described by that person.

## II.     Background and Probable Cause

### A.     Coronavirus Aid, Relief, and Economic Security Act

4.     The Coronavirus Aid, Relief, and Economic Security ("CARES") Act is a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic.

One source of relief provided by the CARES Act was the authorization of billions in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP").[1]

5.     In order to obtain a PPP loan, a qualifying business must have submitted a PPP loan application, which was signed by an authorized representative of the business. The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. In the PPP loan application, the small business (through its authorized representative) must have stated, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures were used to calculate the amount of money the small business was eligible to receive under the PPP. In addition, businesses applying for a PPP loan must have provided documentation showing their payroll expenses.

6.     As part of the PPP loan application, the applicant was required to attest to various certifications regarding the applicant's eligibility. Most, if not all, PPP loan applications included a certification that the information provided in the applications was true and accurate. Based on the information gathered during this investigation, as set forth in this affidavit, I believe that the loan applicants, including RUDIN, lied knowingly and intentionally when making these certifications. Additionally, there were questions regarding the applicant's criminal history. Specifically, for Financial Institution #1, there was a question that asked, "Within the last 5 years, for any felony, has the Applicant (if an individual) or any owner of the Applicant 1) been convicted; 2) pleaded guilty;

---

[1] The program temporarily stopped accepting applications in August 2020, but it opened back up for a second round from January 2021 through May 2021. Loans applied for before August 2020 will be described as "Round 1" loans, whereas loans applied for in 2021 will be referred to as "Round 2" loans.

3) pleaded nolo contendere; 4) been placed on pretrial diversion; or 5) been placed on any form of parole or probation (including probation before judgment)?" Other financial institutions accepting PPP applications had similarly worded questions regarding the applicant's criminal history.

7.     A PPP loan application had to be processed by a participating financial institution (the lender). If a PPP loan application was approved, the participating financial institution funded the PPP loan using its own monies, which are 100% guaranteed by the SBA. Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan. The lenders submitted the information over the internet, thus consisting of wire communications, to the SBA. The SBA's computer server to receive lender information was located in the Eastern District of Virginia ("EDVA"). Upon receipt of data from the lender, the SBA server performed a number of checks to determine basic loan eligibility and compliance with the PPP. If the submission met requirements, the SBA would authorize the loan, issue an SBA loan number and send an email back to the lender with this information. As a result, this process normally involved the sending and receiving of interstate wires. As detailed more fully below, RUDIN conspired with others to defraud the SBA and submitted or caused to be a submitted a PPP loan application to Financial Institution #1, whose server is located outside of EDVA, and the loan information was then sent to the SBA's server within EDVA, therefore causing an interstate wire to occur.

8.     PPP loan proceeds were required to be used by the business for certain permissible expenses—payroll costs, interest on mortgages, rent, and utilities. The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business spent the loan proceeds on these expense items within a designated period of time (usually within eight weeks of receiving the

proceeds), used a certain percentage of the PPP loan proceeds on payroll expenses, and provided the required supporting documentation.

### B.     Summary of PPP Loan Fraud

9.     Between April 2020 through at least May 2021, RUDIN, along with other co-conspirators, including UCC-1, UCC-2, and UCC-3 (collectively the "conspirators" or "co-conspirators"), conspired to defraud at least eight (8) different financial institutions and the United States Government of over $100 million, of which approximately $46 million was disbursed, by submitting, participating in the preparation of, or preparing supporting documentation for, over 80 PPP loan applications.  Most, if not all, of the PPP loan applications contained documentation purportedly prepared by UCC-1 through the tax preparation firm, Mana Tax Services, Inc. ("MANA TAX").

10.     The purpose of the conspirators' scheme was to obtain money from financial institutions through false and fraudulent PPP loan applications and then to obfuscate the original source of the funds by transferring the funds through various bank accounts associated with other entities controlled by the conspirators, mainly UCC-2.  The investigation showed that during Round 1 of the program, RUDIN, with the help of UCC-2 and UCC-3, approached a number of individuals for PPP loans.  All of the loan applications included purported IRS tax returns as supporting documentation.  However, with the exception of a few businesses, the IRS had no records of the returns ever being filed.[2]  The co-conspirators intentionally inflated the monthly payroll costs, as well as the number of employees employed by the businesses on the loan applications, to qualify for higher loan amounts.  In order to apply for the loans, bank accounts had to be open at the financial

---

[2] For the few entities that did have returns on records with the IRS, the business owners explained that the returns included with their PPP loan applications were false.

institutions to receive the loan proceeds, and UCC-1, UCC-2, and UCC-3 sometimes escorted clients to specific bank branches to open these accounts. Once the PPP loans were obtained, MANA TAX took a hefty fee of 30% of the loan value. UCC-3 typically contacted the business owners he referred for payment of the 30% fee to MANA TAX and, at the direction of UCC-2, told the business owners to obtain a cashier's check made payable to another entity controlled by UCC-2, including Gulfstream Exchange. UCC-2 instructed UCC-3 to have the business owners memorialize falsely the reason for the payments as "payroll" or "intercompany payroll" on the memo line of the checks.

11.     In Round 2, UCC-1 played an integral role in applying for the PPP loans at the direction of RUDIN. The PPP loan applications in Round 2 again included grossly inflated payroll costs and number of employees; however, witness interviews of the individuals, whose names were listed as the loan applicants, revealed that some of the purported businesses did not exist at all. Similarly, in Round 2 some of the PPP funds were routed through entities controlled by UCC-2. Thus far, law enforcement has been able to trace funds from at least five PPP loans, totaling nearly $7 million, that were deposited directly to bank accounts for which UCC-2 had signatory authority. In addition to the funds from the PPP loans that were deposited directly into bank accounts controlled by UCC-2, UCC-2's entities have collected at least $3 million of fees from other PPP loans that were filed by MANA TAX or submitted supporting documentation prepared by MANA TAX.

12.     The initial investigation was focused on eleven PPP loan applications, including one for MANA TAX and one for another company ("Company #1"), which will be further detailed below. In April 2021, law enforcement obtained an e-mail search warrant to Google for e-mail accounts associated with RUDIN, UCC-1, and MANA TAX, among others.[3] The results

---

[3] U.S. Magistrate Judge John F. Anderson from EDVA issued the search warrant under seal in case no. 1:21-sw-229.

of the email search warrant revealed that RUDIN, UCC-1, UCC-2, and UCC-3 communicated frequently with one another about the PPP loan applications and the loan process. Also, in April 2021, law enforcement learned that Financial Institution #4, had conducted their own internal investigation into PPP loan applications associated with MANA TAX and had frozen numerous bank accounts due to suspected fraudulent activity. As the investigation developed, law enforcement uncovered a much larger PPP fraud scheme than just the original 11 PPP loan applications. Specifically, MANA TAX had been listed as the tax preparer firm on supporting documentation submitted with PPP applications for at least 89 different PPP loans.

13. On or about June 4, 2021, I obtained multiple search warrants from the Central District of California including for the residences of RUDIN and UCC-1 and for the persons of RUDIN, UCC-1, UCC-3, and UCC-2. [4]

14. During and after the execution of the California search warrants in mid-June 2021, the FBI interviewed a number of individuals with first-hand knowledge of the co-conspirators, MANA TAX, and the PPP loan applications. I believe that these individuals provided reliable and credible information as their statements were consistent with those made by other co-conspirators and were corroborated by other evidence obtained during the investigation, including the email search warrants. In general, these individuals explained during their consensual interviews that they were told by the co-conspirators, typically RUDIN, UCC-1, or UCC-3, that their businesses could qualify for a PPP loan. The individual business owners that were interviewed explained that they would provide information to the co-conspirators about their business, either by e-mail or verbally. Often times, RUDIN incorrectly told the business

---

[4] Case No. 2:21-mj-2733 (United States District Court for the Central District of California) remains under seal, as do the other California search warrants.

owners that for the purposes of calculating the number of employees, anyone that performed any sort of work for the business could be considered an employee. The individual business owners did not submit their PPP loan applications themselves; rather, they provided their online banking information to the co-conspirators, who would then submit the PPP applications for the businesses. Most of the business owners that were interviewed had not seen their PPP loan applications or the supporting documentation that was submitted with them. When I showed the business owners their PPP applications and supporting documentation, including IRS Forms 941, Employer's Quarterly Federal Tax Return[5], the business owners appeared to be surprised by the information and admitted that the information listed on the applications and Forms 941 was false. UCC-1's name was listed as the preparer on all of the tax forms submitted in support of the PPP loan applications that I have reviewed. According to a number of the business owners I interviewed, UCC-3 recruited them and referred other small business owners to RUDIN and/or UCC-1 to apply for PPP loans. RUDIN and UCC-3 also advised some of the business owners seeking the PPP loans that they had to pay a "fee" to UCC-2 and/or MANA TAX, which was generally 30% of the value of the loan. Public records revealed that UCC-2 was listed as the Vice President and Director of MANA TAX with the Hawaii Department of Commerce and Consumer Affairs. UCC-2 served in a financial role during the conspiracy and was responsible for collecting and receiving fees from the proceeds of the fraudulent PPP loans.

C.     **RUDIN's Background**

15.     Prior to his involvement in the instant conspiracy, RUDIN was convicted of wire fraud and aggravated identity theft in the Northern District of California. RUDIN was released from

---

[5] The IRS Form 941 reports income taxes, Social Security tax, and/or Medicare taxes withheld from employees' paychecks, as well as the employer's portion of certain taxes.

the Bureau of Prisons ("BOP") in April 2018 after serving a five-year sentence. RUDIN's participation in the PPP loan fraud scheme took place after his release from BOP but while he was serving a three-year term of supervised release, which ended on April 2, 2021.

16. During his participation in this conspiracy, RUDIN told a number of small business owners on a number of different occasions, that he was knowledgeable about getting money from the federal government, he had prior experience working for the IRS, and he was familiar with the PPP loan process. RUDIN did not disclose to prospective clients that he was a convicted felon or that there was a restitution judgment against him for $40 million dollars as a result of his prior criminal conviction.

**D.    PPP Loan for Mana Tax Services, Inc.**

17. On May 8, 2020, a PPP loan application for MANA TAX was submitted to Financial Institution #2, listing the loan applicant as UCC-1.[6] In this case, MANA TAX already had a bank account at Financial Institution #2, which was controlled by UCC-1 and UCC-2, and which was the bank account where the PPP funds were deposited to. Financial Institution #2 provided Internet Protocol ("IP") addresses for logging into MANA TAX's online banking portal, which is how the PPP loan application had to be accessed. On May 8, 2020, the same date the PPP application was submitted for MANA TAX, the online banking portal for MANA TAX was accessed by IP address 172.115.78.89, which according to subscriber records provided by the Internet Service Provider ("ISP") comes back to an address in Chino, California, and which is the address listed on RUDIN's driver's license. Additionally, the subscriber records from the ISP list telephone number 909-203-6734 as the subscriber contact number. This telephone number is serviced by AT&T, and AT&T's

---

[6] Financial Institution #2 limited PPP loan applications to those applicants who had accounts at the bank. As a result, the co-conspirators would direct businesses to the financial institution, to open accounts, in order to apply for the PPP loans.

subscriber records list RUDIN as the subscriber of 909-203-6734.  Additionally, the agents executing

a search warrant at the Chino address, learned that RUDIN no longer lived there from the occupants:

instead, it was the home for RUDIN's handicapped brother and his caretakers.  The caretakers

admitted RUDIN had hired them to care for his brother at that residence and they also participated

in the PPP loan fraud scheme at RUDIN's and UCC-1's direction.  One caretaker explained that

RUDIN lived there prior to her moving into the residence in or about March 2021.  Because the

addresses for UCC-1 and MANA TAX are not located in Chino, California (which was the location

of the IP address that accessed the online banking portal to submit the MANA TAX PPP loan and

was RUDIN's last known address), I believe that it was RUDIN, or someone acting under his

direction and supervision, who filed the MANA TAX PPP loan application.

18.     The MANA TAX PPP loan application included an IRS Form 940, Federal

Unemployment Tax Return, for the year 2019 and an IRS Form 941, Employer's Quarterly Federal

Tax Return, for the first quarter of 2020.[7]  The Form 941 reported 125 employees with total quarterly

compensation of $3,298,349.08.  A review of MANA TAX's bank account at Financial Institution

#2, for between February 2019 and the date of the PPP loan, did not indicate that MANA TAX was

paying employees, and certainly not 125 employees as claimed on its PPP loan application.  In fact,

the average outflow of funds from the bank account between February 2019 and the date of the PPP

loan was only around $4,700 each month, which does not support the claim of paying average

monthly payroll of $292,373 as listed on the PPP application.  The Forms 940 and 941 were

purportedly prepared by UCC-1 and MANA TAX; however, according to the IRS, these forms were

not filed with the IRS.  Further, according to UCC-1, during a voluntary interview pursuant to the

terms of a written proffer agreement that his truthful statements would not be used against him, UCC-

---

[7] The IRS Form 940 reports an employer's annual federal unemployment tax.

1 stated that while he did work for MANA TAX, he did not prepare these particular forms nor submit the PPP loan application for MANA TAX. Additionally, through interviews of UCC-1 and other individuals, who did at least some work at some point for MANA TAX, there is no evidence that 125 employees ever worked for MANA TAX during this time period. Even during the time period in early 2021, which likely had the highest number of employees working at MANA TAX, it still did not exceed 20 people.

19.     On May 12, 2020, MANA TAX's bank account at Financial Institution #2, for which UCC-2 and UCC-1 were authorized signers, received $730,932 of PPP loan funds. Upon receiving the PPP loan, funds were transferred to other co-conspirators and other MANA TAX accounts, but it did not appear from bank records that the funds were used to pay the 125 employees claimed in the MANA TAX PPP loan application. Among numerous other financial transactions that occurred after receiving the PPP funds, $50,000 was sent to an entity controlled by UCC-3, and a $438,000 cashier's check (approximately 60% of the loan proceeds) was made payable to MANA TAX. This cashier's check was obtained on or about July 2, 2020, and later deposited into another MANA TAX bank account at a different financial institution ("Financial Institution #3) on or about July 10, 2020, which was well after when one would expect the funds for a PPP loan to have been spent if it was truly needed to pay 125 employees when it was first obtained in early May 2020. Bank surveillance obtained by law enforcement from Financial Institution #3 showed RUDIN depositing the $438,000 cashier's check at Financial Institution #3, indicating that despite RUDIN's name not being listed on any documentation, which was likely due to his supervised release status, RUDIN was still involved in operational and financial activity being conducted in the name of MANA TAX. Prior to the $438,000 deposit into the bank account at Financial Institution #3, the balance was only $70.72 and had very little activity in the prior months. After the $438,000 deposit, the funds were disbursed to numerous individuals and entities, some of which are believed to be co-conspirators involved in other

fraudulent PPP loan transactions that are part of this scheme; however, the transactions do not appear to be legitimate payroll expenses because none of these individuals have any history of being paid as employees prior to this deposit or prior to MANA TAX receiving a PPP loan.

20.     Based on the facts that an IP address tracing back to RUDIN's CHINO address accessed MANA TAX's online banking portal the same day the PPP application was submitted, that UCC-1 told law enforcement during a proffer he did not submit this PPP loan application, and that RUDIN has been involved in the moving of the fraud proceeds, I believe RUDIN was the one who submitted this fraudulent PPP loan application for MANA TAX.  Considering that the funds were received into an account that was controlled by UCC-1 and UCC-2 and ultimately disbursed to a number of co-conspirators, including UCC-3, despite UCC-3 not being a MANA TAX employee, I believe there is probable cause that the conspirators worked in concert together to obtain PPP loan funds.

21.     Notably, in the next year, on April 14, 2021, and less than two weeks after RUDIN finished his term of supervised release, a document was filed with the State of Hawaii listing RUDIN as the Secretary, Chief Financial Officer ("CFO"), and Director of MANA TAX.[8]

**E.      PPP Loan for Company #1**

22.     Company #1 was incorporated in California in December 2011.  Company #1 is owned and operated by an individual, who will hereinafter be referred to as Cooperating Witness #1 ("CW-1").  On November 6, 2018, a form was filed with the State of California listing CW-1 as the CEO, Secretary, CFO, President, and Director of Company #1.

23.     Law enforcement agents initially interviewed CW-1 in June 2021, and CW-1 provided an additional voluntary interview in August 2021.  I believe that the information provided

_____

[8] This same filing also added UCC-3 as the Vice President and Director of MANA TAX.

by CW-1 was based on personal knowledge and was reliable and credible as it was corroborated by records and documents and other statements. During these voluntary interviews, CW-1 provided the following information: Company #1 transports shipping containers from the port of Long Beach all throughout the Los Angeles area. Company #1 has approximately 30 to 33 trucks, 20 to 25 truck drivers, and nine office employees. CW-1 further clarified that between 2018 and 2020, there were about 30 employees on average working for Company #1; however, the majority of them were paid by IRS Form 1099.[9] The weekly payroll for Company #1 depends on how busy the port is, but at the time of the interview, CW-1 estimated the weekly payroll for Company #1 to be about $60,000 to $90,000. In 2020, payroll was significantly less and averaged between $25,000 to $30,000 per week.

24.     CW-1 further explained that CW-1 had known UCC-3 for approximately six years when the pandemic hit. One day, UCC-3 called CW-1 and told CW-1 he could introduce CW-1 to someone (RUDIN) to get a PPP loan for CW-1's business. UCC-3 told CW-1 he had personally received a PPP loan from working with RUDIN, even though he had not. MANA TAX applied for a PPP loan for one of UCC-3's companies, and it too was grossly inflated; however, the loan application was denied, and the PPP loan was ultimately not funded. UCC-3 provided CW-1 with RUDIN's telephone number. CW-1 called RUDIN and then met with RUDIN, UCC-3, and UCC-2 in CW-1's office to discuss PPP loans. Based on a review of toll records for RUDIN's telephone number, 909-203-6734, on May 13, 2020, CW-1 called RUDIN at two different times and spoke for

---

[9] Based on IRS guidance—and my own personal education, knowledge, and experience—an individual being paid as a 1099 is not considered an employee of the company issuing the 1099. An individual being paid as a 1099 is generally considered to be self-employed and is responsible for their own employment taxes as opposed to an individual paid as a W-2 employee, who has their employment taxes withheld through payroll deductions. While PPP loans could be used to cover 1099 employees, the issue, as discussed more fully below, is that false IRS documents were used to substantiate a number of purported "employees."

approximately 13 minutes and 49 seconds on the first call and 2 minutes and 32 seconds on the second call. During the in-person meeting at CW-1's office, RUDIN told CW-1 he could help CW-1 get a PPP loan. According to CW-1, at the meeting, RUDIN identified his company as MANA TAX and said he could get CW-1 between $300,000 and $500,000 for a PPP loan, but RUDIN did not explain how he would get it. CW-1 showed everyone at the meeting (RUDIN, UCC-3, and UCC-2) Company #1's income taxes for 2019 and 2020. UCC-3 and UCC-2 were there for the entire conversation in the office, but RUDIN was the only one explaining anything.

25.     RUDIN told CW-1 that MANA TAX would charge Company #1 $7,500 to handle the PPP loan application. On May 13, 2020, the same day that CW-1 had two phone conversations with RUDIN, CW-1 signed an engagement letter with MANA TAX for COVID-19 Disaster Business Assistance, which referenced the $7,500 fee as RUDIN had previously described.

26.     RUDIN instructed CW-1 to open a new bank account for Company #1 at Financial Institution #1, which CW-1 did on May 19, 2020. A few hours after opening the account, CW-1 sent the online banking login information to RUDIN, which would give RUDIN access to file a PPP loan application on Company #1's behalf.

27.     Based on records I have reviewed that were provided by Financial Institution #1 through a subpoena, between June 5, 2020 and June 12, 2020, a PPP loan application and various supporting payroll documentation for Company #1 were submitted to Financial Institution #1. The IP address used to submit the PPP loan application was 172.115.78.89, which is the same IP address referenced above in paragraph 17 that accessed MANA TAX's online banking portal the same day the MANA TAX PPP loan application was submitted.

28.     The PPP loan application submitted to Financial Institution #1 for Company #1 claimed 443 employees and average monthly payroll of $604,916. It also included IRS Form 940 for the year 2019 and IRS Forms 941 for all four quarters of 2019 and first quarter 2020. According

to what was listed on the IRS Forms, UCC-1 of MANA TAX prepared the forms.  The Forms 941 included with the application reported the following information:

| Company #1's Form 941 Information Included with the PPP Loan Application | | |
|---|---|---|
| Quarter | Stated Number of Employees | Stated Quarterly Compensation |
| 1st Quarter 2019 | 416 | $1,669,570.23 |
| 2nd Quarter 2019 | 421 | $1,742,160.24 |
| 3rd Quarter 2019 | 443 | $1,887,340.26 |
| 4th Quarter 2019 | 443 | $1,959,930.27 |
| 1st Quarter 2020 | 443 | $2,032,520.28 |

29.    During the voluntary interviews with CW-1, law enforcement agents showed CW-1 the PPP loan application and IRS Forms 941 that were submitted with it.  The number of employees listed as 443 for the first quarter was false according to CW-1, who further confirmed that Company #1 never had that many employees, nor did CW-1 ever tell RUDIN that Company #1 had that many employees.  CW-1 also confirmed that the average monthly payroll of over $604,000 listed on the PPP loan application was false, and CW-1 never provided that figure to RUDIN.

30.    The records provided by Financial Institution #1 included an email on or about June 5, 2020, from Financial Institution #1 to an e-mail address appearing to belong to CW-1 due to the e-mail having CW-1's name with the domain @manaservices.net (hereinafter "CW-1@manaservices.net") requesting additional payroll documentation.  CW-1@manaservices.net then replied to the e-mail stating "Hello the application has been updated with requested documents."  The e-mail appears to be signed by CW-1, listing CW-1's name, but the signature block lists RUDIN's telephone after CW-1's name.  During the interview with CW-1, law enforcement agents asked CW-1 about the e-mail address, and CW-1 advised that CW-1 had never seen that e-mail address before.  CW-1 further explained that CW-1 did not write this e-mail, nor did CW-1 ever e-mail Financial Institution #1 about a PPP loan from any e-mail address.

31.     During the interviews with CW-1, CW-1 explained that the day before the PPP loan was funded, RUDIN called CW-1 and said that he had worked really hard on Company #1's PPP loan and got CW-1 a lot more money than originally anticipated.  RUDIN said that due to him working so hard, he was now charging Company #1 and CW-1 30% of the total PPP loan amount as opposed to the original agreed upon amount of $7,500.  CW-1 was not happy with the conversation but felt like getting 70% of the loan proceeds was better than nothing, so CW-1 agreed to pay the 30%.

32.     On June 12, 2020, the Company #1 bank account that CW-1 opened at Financial Institution #1 the month prior received a deposit of $1,512,290 for the PPP loan.  The same day the deposit was received, CW-1 wired $453,687 (30% of the loan) to Gulfstream Exchange, an entity controlled by UCC-2.

**F.     Other PPP Loans**

33.     While none of the PPP loans were applied for in RUDIN's name, which your affiant believes has to do with the fact of his felony fraud conviction and the terms of his supervised release, RUDIN has been linked directly to the scheme in multiple ways.  First, two PPP applications, one for Company #1 and one for another entity, listed 909-203-6734, which phone records reveal is subscribed to by RUDIN.  In connection to the Company #1 PPP loan, as mentioned above, an e-mail sent to Financial Institution #1 from CW-1@manaservices.net provided RUDIN's phone number in the e-mail signature block despite it being signed by "CW-1."  Additionally, as described above, bank surveillance revealed that on July 10, 2020, RUDIN was at Financial Institution #3 depositing a $438,000 cashier's check into an account for MANA TAX.[10]  This check was obtained

---

[10] I am familiar with what RUDIN looks like based on seeing his driver's license photograph and interacting with him in-person.

from the proceeds of MANA TAX's PPP loan that was deposited into a different MANA TAX account at Financial Institution #2.

34.    Also, on August 6, 2020 and September 1, 2020, RUDIN was captured on bank surveillance with UCC-2 at a different financial institution when UCC-2 obtained a $400,000 and a $500,000 cashier's check from bank accounts in the name of CIC Global, Inc. ("CIC GLOBAL"),[11] which is another entity owned and controlled by UCC-2.  My review of bank records revealed these transactions were funded by PPP loan proceeds from three other fraudulent PPP loans associated with MANA TAX through the IRS forms submitted with the PPP loan applications.[12]  These checks were made payable from CIC GLOBAL to Community Investment Corporation ("CIC"), which is another entity controlled by UCC-2.

35.    During an interview of UCC-3, which was also subject to a proffer agreement, UCC-3 explained that he brought clients to UCC-2 to obtain PPP which were in turn directed to RUDIN for application of PPP loans.  UCC-3 further explained that he was often sent to collect the 30% payment on behalf of MANA TAX.  UCC-3 received over $500,000 during the course of the scheme. Later in December 2020 and/or January 2021, which corresponded with Round 2, UCC-3 was present for at least one presentation, in which he brought other individuals, where RUDIN encouraged individuals to use MANA TAX to apply for PPP loans.

36.    As noted above, this scheme involved a number of other PPP loans applied for with supporting IRS documentation that on its face said it was prepared by MANA TAX.  During his interview, UCC-1 explained that his background was in computers, but at the request of his brother,

---

[11] CIC GLOBAL was incorporated in the State of Hawaii on July 25, 2019, listing UCC-2 as the incorporator, CEO, and Director.

[12] For two of the companies, the IRS had no records of the forms ever being filed.  For one of the companies, the returns on record with the IRS reported significantly less payroll and employees than those included with the PPP loan application.

RUDIN, UCC-1 did prepare and submit many of the PPP loans applied for during Round 2. UCC-1 explained that RUDIN would send him clients for PPP loans, some of these clients were clients that were initially approached by UCC-3 in Round 1, and other clients were referred by other individuals to RUDIN. For some of the Round 2 PPP loans, RUDIN sent UCC-1 a spreadsheet, which UCC-1 knew was not accurate, to prepare false PPP loan applications.

37.     Despite not being listed as a loan applicant on any of the PPP loan applications, there is probable cause to believe that RUDIN conspired with UCC-2, UCC-1, UCC-3 and others to commit wire fraud based on the statements of UCC-3 and UCC-1, because MANA TAX prepared PPP loans where UCC-3, UCC-1, and UCC-2 were all listed as applicants, because RUDIN pitched the PPP loan scheme to individuals referred by UCC-3 in which at times both UCC-3 and UCC-2 were present, because some PPP loan applications listed RUDIN's phone number, because RUDIN has been seen on bank surveillance with UCC-2 for transactions associated with PPP loan proceeds, because banks revealed that numerous PPP applications were accessed from IP addresses traced to an address where RUDIN was known to reside at some point during the fraud scheme, because of the frequency and timing of phone conversations with other co-conspirators as learned from toll records, and because of the quantity and substance of e-mails in which RUDIN was communicating with individuals about their PPP loan applications.

### G.     RUDIN's Plans to Flee the Country

38.     As noted above, in June 2021, law enforcement agents executed a search warrant at RUDIN's residence in Chino, California; however, RUDIN was not present. Agents learned from the individuals residing in the residence that RUDIN had recently moved out, but the current occupants were living there and caring for RUDIN's disabled brother. RUDIN did not provide the occupants (and caretakers of his brother) an updated address. By chance, RUDIN was located by law enforcement agents later that evening at a restaurant in Long Beach, California, which is

approximately 50 miles from Chino.  A search warrant was executed on RUDIN's person at that time, and agents discovered on him a United States Passport and $2,800 in cash, along with other items, including a laptop and two cellular telephones.  In my training and experience, it appeared that RUDIN had prepared a "go bag" with essential items allowing him to be highly mobile.  RUDIN's current whereabouts are unknown, and he does not appear to have a steady residence.

39.     On December 17, 2021 and December 20, 2021, UCC-2 informed law enforcement agents of conversations UCC-2 had been having with RUDIN regarding leaving the United States, particularly to evade law enforcement.  In particular, according to UCC-2, RUDIN told UCC-2 "they are bringing the war to us, we gotta fight it outside the country…you gotta get me out."[13]  UCC-2 interpreted that as RUDIN wanting to leave the country.  UCC-2 is a pilot and has the capability to rent a jet and fly it, which RUDIN knows.  RUDIN told UCC-2 "you have access to planes; you can get me out."  UCC-2 mentioned to RUDIN the fact that the government seized his passport during the execution of the search warrant, and RUDIN's response to UCC-2 was that he did not need a passport because he could get a fake identification.   RUDIN mentioned flying to Mexico, Panama, or a "communist country," which UCC-2 believes s Vietnam, given that RUDIN has family ties to Vietnam (his mother and older brother were born there).

40.     In addition to wanting to flee the country, RUDIN has also been requesting UCC-2 to give him significant amounts of money – between $1.3 and $1.9 million dollars.  RUDIN knows that UCC-2 has access to this money because upon receiving proceeds of the fraud scheme outlined above, UCC-2 would go the bank and obtain cashier's checks payable to himself or his businesses and hold on to them.  This has been verified by law enforcement through financial analysis of the

---

[13] Based on the context of the statement: "they are bringing the war to us," I believe that to mean the United States Government is actively investigating RUDIN and others.

bank records for numerous companies associated with UCC-2, and UCC-2 also confirmed that he has access to this kind of money. RUDIN told UCC-2 that if he does not get the money from UCC-2, he is also actively pursuing getting the funds through a merger of another company.[14] Given RUDIN's criminal history and involvement in the fraud scheme outlined in this affidavit, there is probable cause to believe that this "merger" is possibly another fraud scheme, and RUDIN is currently trying to defraud another individual or entity in order to obtain funds to flee the country.

### III. Conclusion

41. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that from at least in or about April 2020 to May 2021, RUDIN has conspired with others, including UCC-2, UCC-1, and UCC-3, to engage in a scheme to defraud, and that between June 5, 2020 and June 11, 2020, RUDIN caused a fraudulent PPP loan application to be sent from Financial Institution #1, which maintained a server outside of EDVA, to the SBA servers located within EDVA in violation of Title 18 U.S.C. § 1349 (conspiracy to commit wire fraud in

---

[14] During the scheme, RUDIN would attempt to explain that the companies could receive certain advantages, by "merging" with companies under the MANA TAX umbrella due to "affiliation" rules. Additionally, RUDIN and UCC-2 had approached at least one professional athlete about "investing" or "purchasing" an airplane. The investigation has found evidence of jets being rented at various times for various purposes, but no investment or purchase for a specific jet has been found.

violation of 18 U.S.C. § 1343). Additionally, there is increasing concern that RUDIN is actively planning to flee the country to evade prosecution. Therefore, I respectfully request that an arrest warrant be issued for RUDIN.

Respectfully submitted,

Jamie M. Vera
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to in accordance with Fed. R. Crim. Proc. 4.1
by telephone on December 23, 2021.

John F. Anderson  Digitally signed by John F. Anderson
Date: 2021.12.23 12:02:12 -05'00'

Honorable Judge John F. Anderson
UNITED STATES MAGISTRATE JUDGE